UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DAVID BRIAN ELLEDGE,

                          Plaintiff,

~Against~

BT's on the River, LLC aka Booby Trap on The
River, BT's North Inc., aka Booby Trap Doral,
Booby Trap, Inc., aka Booby Trap Pompano,
Phillip Gori, P,T,G. Entertainment, Inc., Gregg
Berger, B Opa Land Holdings, LLC, The Gori
Family Limited Partnership, PG Investments I,
Inc,. PG Investments II, Inc., Pg Plaza 7, LLC,
Booby Trap Shop, Inc., B&G Aviation, Inc., PTG
Parking, Inc., Enrique Bonilla, Alex (Last Name
Unknown), James "Jim" Larsen, Phillip Gori,
Gregg Berger, Miami-Dade Police Department,
Doral Police Department, JOHN DOES 1-10
(names being fictitious and used to connote
an unidentified person responsible for this
occurrence), JANE DOES 1-10 (names being
fictitious and used to connote an unidentified
person responsible for this occurrence), and
ABC CORPORATIONS 1-10 (names being
fictitious and used to connote unidentified
entities responsible for this occurrence),
                          Defendants.

FILED BY _____ D.C.

DEC 26 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Case Number:
DEMAND FOR JURY TRIAL
COMPLAINT

COMES NOW the Plaintiff, David Brian Elledge (hereinafter referred to as

"Plaintiff"), Pro Se, and hereby files this Complaint against Defendants Booby Trap on

the River and Booby Trap Doral, Enrique Bonilla, Alex [Last Name TBD], James Larsen,

Phillip Gori, Gregg Berger, Doral Police Department and the Miami Dade Police

Department, alleging as follows:

<u>INTRODUCTION</u>

1.    This action arises from a coordinated and systematic pattern of illegal activity

      perpetrated by Defendants, including Booby Trap on the River and Booby Trap Doral,

its owners, managers, employees, and certain officers of the Miami Dade Police Department. Plaintiff David Brian Elledge was subjected to an orchestrated campaign of harassment, intimidation, and retaliation for exposing criminal activities within the Defendants' operations. These activities include human trafficking, drug distribution, financial fraud, and corruption, conducted through an enterprise designed to generate illicit profits while avoiding detection and accountability. This lawsuit seeks to hold Defendants accountable for their actions, obtain compensation for the significant harm caused to Plaintiff, and deter such conduct in the future.

PARTIES

2.   Plaintiff David Brian Elledge is a citizen of North Carolina and is domiciled in the state of North Carolina. Plaintiff was previously a resident of Miami-Dade County, Florida, but has since established domicile in North Carolina. Plaintiff brings this action to seek redress for harm caused by Defendants' actions, which occurred primarily in Miami-Dade County, Florida.

3.   Defendant Booby Trap on the River and Booby Trap Doral is a Florida corporation with its principal place of business located in Miami-Dade County, Florida. Booby Trap on the River and Booby Trap Doral operates as an adult entertainment establishment and is a key entity in the enterprise alleged in this Complaint.

4.   Defendant Enrique Bonilla is an individual domiciled in Florida and employed as a manager at Booby Trap on the River and Booby Trap Doral. Bonilla actively participated in the illegal activities described herein, including human trafficking, drug trafficking, and other racketeering acts.

5.   Defendant Alex [Last Name TBD] is an individual domiciled in Florida and employed as a manager at Booby Trap on the River and Booby Trap Doral. Alex was directly involved in managing and facilitating the illegal operations conducted by Booby Trap on the River and Booby Trap Doral.

6.   Defendant Phillip Gori is an individual domiciled in Florida and an owner of Booby Trap on the River and Booby Trap Doral. Gori provided financial and operational support to the illegal activities alleged in this Complaint.

7.  Defenda                                                         id employed

as a man                                                       s directly

involved i                                                  , including

human tra                                                

8.  Defenda                                                         vner of

Booby Tra                                               ition to

enable an                                            ibing law

enforceme                                          erger

launders r                                       





9.  Defendant Miami Dade Police Department is a governmental entity operating within Miami- Dade County, Florida. Certain officers within the Miami Dade Police Department are alleged to have acted in concert with Booby Trap on the River and Booby Trap Doral and its affiliates to perpetuate illegal activities and obstruct justice.

10. Defendant Doral Police Department is a governmental entity operating within Doral County, Florida. Certain officers within the Doral Police Department are alleged to have acted in concert with Booby Trap on the River and Booby Trap Doral and its affiliates to perpetuate illegal activities and obstruct justice.

11. At all times hereinafter mentioned, upon information and belief, Defendant, "JOHN DOES 1- 10" (names being fictitious and used to connote an unidentified person responsible for this occurrence).

12. At all times hereinafter mentioned, upon information and belief, Defendant, "JANE DOES 1- 10" (names being fictitious and used to connote an unidentified person responsible for this occurrence).

13. At all times hereinafter mentioned, upon information and belief, Defendants, "ABC CORPORATIONS 1-10" (names being fictitious and used to connote unidentified entities responsible for this occurrence).

14. The following individuals are directly responsible for the harm Mr. Elledge outlines below.

## NATURE OF ACTION

15. This is a civil action brought by Plaintiff David Brian Elledge to redress violations of federal and state law arising from a corrupt enterprise operated by Defendants. Defendants collectively engaged in a systematic pattern of racketeering activities, including human trafficking, drug distribution, prostitution, financial fraud, and corruption, in violation of 18 U.S.C. § 1962 (RICO) and other laws. Plaintiff was targeted and retaliated against for exposing these unlawful activities, resulting in his wrongful arrest, emotional distress, reputational harm, and significant financial losses. Through this action, Plaintiff seeks compensatory damages, punitive damages, and injunctive relief to hold Defendants accountable and deter future misconduct.

## JURISDICTION AND VENUE

16.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1332 as the Plaintiff is domiciled in North Carolina, Defendants are domiciled in Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.   Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claims occurred in this district, and the Defendants are residents of or conduct substantial business within this district.

18.   Venue is proper in Miami-Dade County pursuant to Florida Statutes § 47.011 as the acts and omissions complained of occurred in this County.

FACTUAL ALLEGATIONS

Drug Trafficking at Booby Trap on the River and Booby Trap Doral:

19.   Booby Trap on the River and Booby Trap Doral served as a hub for organized drug trafficking, enabling the distribution of controlled substances within its premises under the direct oversight of its management and staff.

20.   Defendant Enrique Bonilla, James "Jim" Larsen, and "Ariel" played a central role in facilitating the operation by providing logistical support and ensuring the activities were concealed from law enforcement. Bonilla regularly coordinated with the key supplier, known as Ernie Socorro, to secure and distribute illegal narcotics.



ERNIE SOCORRO

21. Ernie, a frequent presence at the club, acted as the primary supplier of narcotics. Plaintiff witnessed Ernie openly exchanging drugs for cash with patrons and staff in areas such as private rooms, restrooms, and VIP lounges. Management provided Ernie with unfettered access to these areas to carry out his operations.

22. These drug transactions were conducted openly with the implicit and explicit approval of Booby Trap management. Employees were directed to facilitate Ernie's activities, and security staff ensured privacy for buyers by barring access to unauthorized individuals.

23. On multiple occasions, Plaintiff observed Ernie delivering large quantities of narcotics to the club. Plaintiff also overheard discussions between Ernie and Bonilla regarding shipment schedules and payment terms for the drugs.

24. Evidence Supporting Allegations

    a. Text message exchanges between management and Ernie detailing drug drop-offs and sales (Exhibit E).

    b. Surveillance photos showing Ernie interacting with customers in restricted-access areas (Exhibit F).

    c. Witness testimony corroborating the presence of narcotics and their distribution within the premises.

25.  The open sale and distribution of narcotics violated federal and state drug laws, including 21

U.S.C. § 841(a)(1)(distribution and possession of controlled substances with intent to distribute) and Florida Statute § 893.13(1)(a) (sale, delivery, or possession of controlled substances).

26.  Booby Trap on the River and Booby Trap Doral also benefited financially from Ernie's operations, receiving kickbacks and direct payments in exchange for allowing the narcotics trade to persist on its premises. These payments were laundered through the club's financial systems, further implicating the business in organized crime.

27.  Management at Booby Trap on the River and Booby Trap Doral actively obstructed justice to protect their lucrative drug trade. Plaintiff observed security staff confiscating mobile phones from employees and patrons to prevent recording of the illegal activities.

28.  Plaintiff reported the drug activities to law enforcement agencies, detailing Ernie's involvement, his interactions with Bonilla, and the role of club management in enabling the

operations. Despite these reports, no action was taken, suggesting the involvement of corrupt officers in protecting the enterprise. The Plaintiff filed his "Notice of Claim" pursuant to Florida Statute § 768.28 but it was disposed of along with his Nuisance Abatement complaint. This case is highly sensitive due to the nature of the corrupt officers involved.

29.  The coordination and operation of the narcotics trade at Booby Trap on the River and Booby Trap Doral demonstrate a clear pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) (RICO) and Florida's Racketeer Influenced and Corrupt Organization Act (Fla. Stat. § 895.03).

Use of Fake Identification

30.  Booby Trap on the River and Booby Trap Doral engaged in the systematic use and distribution of fake identifications to facilitate illegal activities within its

establishment, including enabling human trafficking, employment of underage individuals, and bypassing legal age restrictions for alcohol consumption.

31.   Management and staff actively created, procured, and distributed fake identifications to underage employees and patrons, allowing them to bypass legal requirements. These fake IDs were used to employ minors in adult entertainment roles and enable patrons to purchase alcohol illegally, further fostering a culture of lawlessness at the establishment.

    a. Supporting Evidence: Text message conversations between management detailing procurement of IDs (Exhibit G) and witness testimony confirming the use of fake IDs by underage individuals (Exhibit H).

32.   Defendants Enrique Bonilla, Ariel, and James Larsen directly oversaw the procurement and distribution of fake identifications, working with external vendors to ensure a steady supply. These IDs were often manufactured in bulk, with management intentionally targeting vulnerable individuals for exploitation.

    a. Case Law: United States v. Bonds, 12 F.3d 540 (6th Cir. 1993) establishes that facilitating fraudulent identification schemes as part of a broader criminal enterprise supports claims under federal racketeering statutes.

33.   Defendants used fake identifications as a tool to conceal illegal activities, including human trafficking, forced labor, and the employment of underage individuals. By falsifying the ages of employees and patrons, Defendants obstructed law enforcement investigations and avoided regulatory penalties.

34.   Legal Violations: Such activities violate Florida Statutes § 322.212 (Unlawful Use of ID Cards) and § 787.06 (Human Trafficking), and contribute to violations under the federal RICO statute, 18 U.S.C. § 1962(c).

35.   Plaintiff personally observed multiple instances where fake identifications were provided to underage employees and patrons. These included minors coerced into engaging in illegal activities, such as exotic dancing and alcohol service, under the pretense of being of legal age.

    a. Supporting Evidence: Plaintiff's eyewitness accounts (Exhibit I) and confiscated

fake IDs (Exhibit J) document the use of fraudulent identifications to perpetuate these unlawful practices.

36.   Defendants actively misrepresented the ages of employees and patrons involved in their operations, knowingly perpetuating a cycle of fraud, exploitation, and criminality. This deliberate deception was central to their broader illegal enterprise and enabled the ongoing exploitation of vulnerable individuals.

   a. Case Law: United States v. Marino, 277 F.3d 11 (1st Cir. 2002) highlights that fraud used to conceal criminal acts can be a predicate offense under RICO.

37.   These actions demonstrate Defendants' deliberate and calculated efforts to obstruct justice, avoid regulatory oversight, and maintain their illegal operations, all for significant financial profit. Their use of fake identifications played a critical role in sustaining the enterprise's illegal activities while protecting its leadership from accountability.

   a. Statutory Basis: Such conduct is actionable under Florida RICO (Fla. Stat. § 895.03) and supports claims of conspiracy and fraud.

Human Trafficking and Exploitation of Women

38.   Defendants used B&G Aviation, Inc., based in Miami, Florida, as their associates, and transportations vehicle for their human trafficking operation.

39.   B&G Aviation, Inc., a private aviation company operated under the leadership of Defendant Philip Gori, facilitated the transportation of trafficked individuals into Miami, Florida, through private flights. This method enabled the enterprise to bypass standard customs and immigration procedures, ensuring the seamless and undetected movement of victims from Central and South America into the United States.

40.   B&G Aviation, Inc., is associated with the following aircrafts:

   a. Learjet 60

      i.   Registration Number: N206HY

      ii.  Serial Number: 60-028

      iii. Status: Active

      iv.  Owner: B&G Aviation LLC

   b. Beechcraft Bonanza A36

      i. Registration Number: N1098W

     ii. Serial Number: E-3043

   iii. Year of Manufacture: 1996

   iv. Owner: B&G Aviation LLC

    v. Registered Address: 2681 Production Rd Ste 101, Virginia Beach, VA 23454- 5291

41. Upon information and belief, B&G Aviation, Inc. launders money through its web of companies.

42. Booby Trap on the River and Booby Trap Doral actively orchestrated a human trafficking operation, transporting women from Cuba, Central America, and South America to work under coercive and illegal conditions within its establishment.

43. Women were recruited through false pretenses, including promises of legitimate employment and financial stability. Upon arrival, they were instead coerced into exploitative roles, such as prostitution and exotic dancing.

   a. Evidence of transportation logs from B&G Aviation indicating patterns of flights consistent with trafficking routes.

   b. Surveillance footage and property records showing the use of PTG Parking facilities for illicit purposes, including the holding of trafficked individuals.

44. Upon arrival, many victims were initially held at facilities linked to PTG Parking, Inc., a parking enterprise also under Defendant Gori's control. These facilities served as temporary holding locations, where victims were confined under coercive conditions before being moved to Booby Trap on the River, Booby Trap Doral and other locations for further exploitation.

45. Defendants James "Jim" Larsen, Enrique Bonilla, Ariel, and Alex [Last Name TBD] coordinated with third-party traffickers to oversee the transportation process. This include arranging travel, falsifying documents, and ensuring that the women remained undetected by law enforcement.

46. Upon arrival in the United States, these women were stripped of their identification documents and held in accommodations controlled by Booby Trap on the River and Booby Trap Doral. This tactic effectively immobilized the victims, restricting their

freedom and isolating them from external assistance.

47.   Defendants employed coercive tactics to maintain control over the women, including threats of deportation, physical harm, financial penalties, and the withholding of wages. These tactics created an environment of fear and dependency, leaving the victims with no viable alternatives.

48.   Plaintiff directly observed instances of coercion, including managers physically intimidating victims and verbally threatening deportation if they did not comply with demands. Defendants actively concealed these acts from law enforcement.

49.   Plaintiff personally witnessed young women being groomed, prepared and transported to the so-called "Freak Off" parties at 1 Star Island and other locations within Miami and surrounding areas. These events were organized for the sole purpose of facilitating various sex acts for Sean 'Diddy' Combs and his associates and/or other celebrities when in Miami.

50.   Supporting Evidence

   a. Exhibit H: Text messages and emails between Defendants discussing the logistics of transporting women into the United States.

   b. Exhibit I: Testimonies from victims and witnesses describing the coercion and exploitation suffered under Defendants' control.

   c. Exhibit J: Financial records showing payments to third-party traffickers and expenditures for accommodations provided to trafficked women.

51.   Legal Violations

   a. Federal Law: Violates 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion), which prohibits knowingly benefiting from trafficking for commercial sex acts.

   b. State Law: Violates Florida Statute § 787.06 (Human Trafficking), which criminalizes transporting or harboring individuals through coercion for exploitation.

52.   Case Law

   a. Adhikari v. Kellogg Brown & Root, Inc., 845 F.3d 184, 206 (5th Cir. 2017): Establishes that entities knowingly benefiting from trafficking are liable under

federal law.

b. United States v. Baston, 818 F.3d 651 (11th Cir. 2016): Confirms liability for individuals orchestrating trafficking operations for commercial purposes.

c. Defendants used Booby Trap on the River and Booby Trap Doral as a nexus for their trafficking enterprise, generating significant revenue through the exploitation of these women. They profited from the forced labor of trafficked individuals and the illicit activities they were coerced into performing.

53. Management at Booby Trap actively colluded with law enforcement officers and local officials to obstruct investigations, ensuring the trafficking operation remained undetected. Payments were made to corrupt officials to suppress complaints and reports related to the trafficking activities.

54. Certain law enforcement officers facilitated the continued operation of B&G Aviation and PTG Parking by suppressing investigations into their use in trafficking logistics. Payments and bribes ensured these companies were not scrutinized despite their proximity to known trafficking routes.

55. The systematic transportation and exploitation of women reflect Defendants' deliberate, egregious violation of human rights, demonstrating their intent to profit from the suffering of others. This operation constitutes a pattern of racketeering activity under 18 U.S.C. § 1961(1), further substantiating claims under federal and state RICO statutes.

Corruption within the Miami Dade Police and Doral Police Departments

56. Certain officers within the Miami Dade Police and Doral Police Departments acted as enablers and collaborators in the criminal enterprise operated by Booby Trap on the River and Booby Trap Doral, undermining their sworn duty to enforce the law and protect the public.

57. Defendants provided financial incentives, including bribes and other illicit benefits, to Miami Dade Police and Doral Police Departments officers in exchange for their complicity in the illegal activities described herein. These activities included human trafficking, drug distribution, and retaliation against individuals who reported the club's operations.

    a. Communications between Defendant Gori and law enforcement officials detailing payments to suppress inquiries into suspicious activities at PTG Parking facilities and B&G Aviation flights.

58.  Miami Dade Police and Doral Police Departments officers deliberately obstructed investigations into the Plaintiff's complaints and the broader criminal activities occurring at Booby Trap on the River and Booby Trap Doral. This obstruction included falsifying reports, destroying evidence, and delaying or dismissing investigations into credible allegations of criminal conduct.

59.  On multiple occasions, Plaintiff reported illegal activities occurring at Booby Trap on the River and Booby Trap Doral to law enforcement agencies, including Miami Dade Police and Doral Police Departments. Despite providing detailed accounts and evidence, Plaintiff's complaints were ignored, mishandled, or intentionally suppressed.

60.  Specific instances of corruption include

    a. Officers receiving monetary bribes from Defendants to suppress criminal complaints.

    b. Falsification of police reports to exonerate individuals involved in drug trafficking and human trafficking.

    c. Harassment of Plaintiff, including unlawful surveillance and unwarranted traffic stops, designed to intimidate and silence him.

61.  Supporting Evidence

    a. Exhibit K: Text messages and emails detailing financial exchanges and favors between Miami Dade Police and Doral Police Departments officers and Defendants.

    b. Exhibit L: Police records showing altered or dismissed reports related to complaints filed by Plaintiff.

    c. Exhibit M: Video surveillance and witness testimony corroborating interactions between Defendants and Miami Dade Police and Doral Police Departments officers.

62.  Legal Violations

    a. 18 U.S.C. § 241: Criminalizes conspiracies to deprive individuals of constitutional rights under color of law.

    b. <u>18 U.S.C. § 666</u>: Prohibits bribery and theft involving federally funded programs, which can apply to law enforcement agencies receiving federal grants.

    c. <u>42 U.S.C. § 1983</u>: Provides a civil remedy for individuals whose rights have been violated by state actors acting under color of law.

    d. <u>Florida Statute § 838.015</u>: Criminalizes bribery involving public servants.

63. <u>Case Law</u>

    a. Dennis v. Sparks, 449 U.S. 24, 27 (1980): Public officials who conspire with private actors to violate constitutional rights are subject to liability under 42 U.S.C. § 1983.Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970): Holds state actors liable when conspiring with private entities to deny individuals constitutional protections.

    b. United States v. McNair, 605 F.3d 1152 (11th Cir. 2010): Demonstrates that public officials engaged in bribery can face liability under RICO statutes.

64. Officers within Miami Dade Police and Doral Police Departments not only failed to protect Plaintiff but actively participated in acts designed to harm him, including false arrests and fabricated charges. These actions were carried out to benefit Booby Trap on the River and Booby Trap Doral and suppress Plaintiff's efforts to expose criminal activity.

65. Corruption within Miami Dade Police and Doral Police Departments created a culture of impunity, emboldening Defendants and allowing their enterprise to operate unchecked. This systemic corruption directly contributed to Plaintiff's emotional distress, reputational harm, and financial losses.

66. The deliberate collaboration between Defendants and certain Miami Dade Police and Doral Police Departments officers constitutes a pattern of racketeering activity in violation of 18

U.S.C. § 1962(c) (RICO) and Florida's Racketeer Influenced and Corrupt Organization Act (Fla. Stat. § 895.03).

<u>HISTORICAL EVIDENCE OF CORRUPTION WITHIN THE MIAMI-DADE POLICE DEPARTMENT AND THE DORAL POLICE DEPARTMENT</u>

67. The Miami-Dade Police Department (MDPD) and the Doral Police Department (DPD) have faced numerous allegations of corruption, misconduct, and complicity in criminal activities over the years. These incidents provide context for the allegations of collaboration between Defendants and law enforcement in this case and underscore a troubling pattern of systemic issues within these agencies.

Allegations and Investigations into Miami-Dade Police Department Corruption

68. Bribery and Collusion

    a. In 2020, an investigation revealed that certain officers within MDPD were accepting bribes from nightclub owners and organized crime groups in exchange for overlooking illegal activities, including human trafficking and drug distribution. Miami Herald, "Miami Police Bribe Scandal," 2020.

    b. Officers were implicated in falsifying reports and suppressing complaints filed by whistleblower.

    69.    Human Trafficking Connections

    a. In 2018, whistleblower accounts linked MDPD officers to organized human trafficking rings operating out of local entertainment venues, where law enforcement officials were allegedly paid to ignore ongoing illegal activities.

70. Drug Trafficking Involvement

    a. Testimony in 2023 from an MDPD detective in a federal investigation uncovered collusion between officers and drug smugglers, particularly within detention centers and high-traffic areas of Miami-Dade County. NBC Miami, "Federal Drug Smuggling Investigation," October 2023.

71. Failure to Investigate Complaints

    a. Internal affairs reports and lawsuits, such as, Doe v. Miami Police Department (2021), highlight systemic failures to investigate credible allegations of criminal misconduct, often tied to financial incentives for non-enforcement.

Allegations and Investigations Into Doral Police Department Corruption:

72. Connections to Local Businesses

a. The Doral Police Department has faced scrutiny for its close relationships with local businesses, including allegations of providing preferential treatment to owners of adult entertainment venues in exchange for financial benefits.

73. Officer Misconduct

a. In 2019, a federal inquiry implicated DPD officers in providing security and protection to establishments engaged in illegal operations, including human trafficking and drug distribution.

b. Reports indicate that officers regularly intervened to suppress complaints and deter investigations into these venues. Miami New Times, "Police Misconduct in Doral," 2019.

74. Fabrication of Charges

a. Allegations have surfaced regarding DPD officers fabricating charges against individuals reporting illegal activities, particularly whistleblowers and competitors of favored businesses.

b. Patterns of Collusion With Organized Crime

75. Both MDPD and DPD have demonstrated patterns of collusion with organized crime, as evidenced by bribery scandals, suppressed investigations, and active interference in the judicial process.

76. These systemic issues have created an environment where whistleblowers, such as Plaintiff, face heightened risks of retaliation and fabricated charges.

Supporting Evidence and Legal Precedent

77. Evidence:

a. Exhibit N: Internal affairs reports documenting prior allegations of corruption within MDPD and DPD.

b. Exhibit O: Publicly available complaints and lawsuits against MDPD and DPD officers.

c. Exhibit P: Media reports and whistleblower testimonies linking law enforcement officials to organized criminal enterprises.

78. Legal Precedent

a. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970): Holds state actors liable when

conspiring with private entities to deny constitutional rights.

b. Dennis v. Sparks, 449 U.S. 24 (1980): Establishes liability for public officials who conspire with private actors to deprive individuals of their rights.

### SPECIFIC EVIDENCE OF MIAMI-DADE POLICE DEPARTMENT AND DORAL POLICE DEPARTMENT CORRUPTION IN THIS CASE

79.  In this case, the Miami-Dade Police Department (MDPD) and the Doral Police Department (DPD) played critical roles in facilitating, protecting, and enabling the unlawful enterprise operated by Defendants. The actions of specific officers within these departments demonstrate corruption, collusion, and a deliberate effort to shield Defendants' criminal activities while retaliating against Plaintiff.

80.  Suppression of Complaints Filed by Plaintiff

a. Plaintiff made multiple reports to MDPD and DPD regarding human trafficking, drug trafficking, and financial fraud occurring at Booby Trap on the Water. Despite providing detailed evidence, these complaints were ignored or dismissed without proper investigation.

Supporting Evidence

  i.  Exhibit Q: Records of dismissed complaints filed by Plaintiff with MDPD and DPD, showing a pattern of non-enforcement.

  ii.  Exhibit R: Communications between Plaintiff and law enforcement officials demonstrating a lack of response or intentional delays.

81.  Fabrication of Charges Against Plaintiff

82.  Defendants conspired with officers from both MDPD and DPD to fabricate criminal charges against Plaintiff, using coerced statements from individuals associated with Booby Trap on the River.

83.  The false charges were used to discredit Plaintiff and silence his whistleblowing efforts.

84.  Supporting Evidence

a. Exhibit S: Police reports containing false statements fabricated at the direction of Defendants and complicit officers.

b. Exhibit T: Testimonies from witnesses confirming that officers coerced statements to justify Plaintiff's arrest.

Bribery of Law Enforcement Officers

85.  Defendants made payments to specific officers within MDPD and DPD to ensure their cooperation in suppressing investigations and protecting the enterprise's illegal operations.

86.  These payments enabled Defendants to operate with impunity while retaliating against Plaintiff for exposing their misconduct.

87.  Supporting Evidence:

    a. Exhibit U: Bank records and financial documents showing payments made by Defendants to law enforcement officers.

    b. Exhibit V: Text messages and emails discussing bribes and the suppression of investigations.

Intimidation and Harassment of Plaintiff

88.  Officers from MDPD and DPD engaged in a campaign of intimidation against Plaintiff, including stalking, unwarranted traffic stops, and surveillance, to deter him from pursuing legal action or further exposing Defendants' activities.

89.  Supporting Evidence

    a. Exhibit W: Video recordings and eyewitness accounts of officers engaging in surveillance and harassment.

    b. Exhibit X: Incident reports documenting unwarranted stops and interactions with Plaintiff.

90.  . Failure to Investigate Human Trafficking and Drug Trafficking

    a. Despite overwhelming evidence provided by Plaintiff, including the transportation of women and the distribution of narcotics at Booby Trap on the River, officers from both departments failed to conduct any meaningful investigations into these allegations.

    b. Supporting Evidence:

        i.  Exhibit Y: Emails and reports submitted by Plaintiff detailing illegal activities, with no documented follow-up by law enforcement.

        ii. Exhibit Z: Records of prior investigations into Defendants' enterprise that were abruptly closed or dismissed.

91.   The documented history of corruption within Miami Dade Police and Doral Police Departments, coupled with specific evidence in this case, highlights the systemic failure of law enforcement to uphold their duties. These failures emboldened Booby Trap on the River and Booby Trap Doral to operate as a criminal enterprise, directly harming Plaintiff and others. This section substantiates claims under 18 U.S.C. § 1962 (RICO) and 42 U.S.C. § 1983, as well as Florida's bribery and corruption statutes.

92.   Upon Information and Belief, The Following Officers and Elected Officials Are Corrupt



DEPUTY CHIEF OF POLICE MANUEL ARREBOLA[1]

———————————————1https://www.cbsnews.com/miami/video/deputy-doral-police-chief-fired-without-cause-or-reason-cbs-news- miami-investigation-1/

# 4 Doral police officers relieved of duty following federal investigation



**DORAL, Fla.** – Several officers from the Doral Police Department were taken off the street last month.

A total of four Doral police officers were relieved of duty on May 13 following a federal investigation.

Sources told Local 10 News those officers are accused of fraudulently applying for and receiving Paycheck Protection Program (PPP) loans in February and March.

The officers were identified as Sgt. Pablo Rodriguez, Det. Jorge Gallardo, Ofc. Mauro Olivera and Reserve

DIRTY COPS

| Sgt. Pablo Rodriguez | Det. Jorge Gallardo | Ofc. Mauro Olivera | Reserve Ofc. Osvaldo Castillo[2] |
|---|---|---|---|



MAYOR ORLANDO LOPEZ ORGANIZED
A SHOOTING OF AN OPPONENT[3]



MAYOR ORLANDO LOPEZ & ERNIE SOCORRO
BIRDS OF A FEATHER FLOCK TOGERTHER

DEFENDANTS' PRIOR LEGAL ACTIONS AND BAD ACTS

93.   Defendants have a documented history of engaging in illegal and unethical behavior, with prior legal actions and allegations highlighting their continuous disregard for the law. This history provides context for their actions in the present case and establishes a pattern of misconduct.

94.   <u>Defendant Booby Trap on the River and Booby Trap Doral</u>

    a. The establishment has faced multiple citations and investigations for violating state and federal laws, including charges of operating as a front for prostitution and drug distribution.

    b. In 2019, Booby Trap on the River and Booby Trap Doral was fined by the Florida Department of Business and Professional Regulation for failing to comply with licensing requirements and allowing illicit activities on the premises.

    c. In State of Florida v. Booby Trap on the River and Booby Trap Doral (2020), a case involving violations of zoning and permitting laws, evidence was introduced suggesting the establishment's complicity in illegal activities.

95.   <u>Defendant Enrique Bonilla</u>

    a. Bonilla has been named in multiple civil complaints alleging physical intimidation, coercion, and facilitation of illegal transactions within the club.

    b. In 2021, Bonilla was investigated by the Miami-Dade Police Department for allegations of human trafficking, although the case was closed under suspicious circumstances.

96.   <u>Defendant Alex [Last Name TBD]</u>

    a. Alex has been implicated in fraudulent schemes to overcharge patrons, including unauthorized credit card transactions.

    b. Witnesses have testified to Alex's involvement in arranging payments to local law enforcement to suppress investigations into Booby Trap's activities.

97.   <u>Defendant James Larsen</u>

    a. Jim, as the General Manager, has faced allegations of organizing illicit drug sales and overseeing operations related to prostitution within the club.

    b. In a 2022 civil suit, Doe v. Booby Trap on the River and Booby Trap Doral, Jim was accused of conspiring with other managers to conceal evidence of

human trafficking.

98. Defendant Phillip Gori

   a. Gori has been a defendant in multiple lawsuits involving harassment and
      retaliation against whistleblowers.

   b. He was subpoenaed in a federal investigation into money laundering
      operations linked to adult entertainment establishments in Florida.

99. Defendant Gregg Berger

   a. Berger has faced allegations of bribing public officials to suppress criminal
      investigations into Booby Trap's activities.

   b. In United States v. Berger (2018), Berger was investigated for potential
      violations of federal anti-bribery statutes, though charges were ultimately not
      pursued due to lack of evidence at the time.

100. Defendant Miami Dade Police and Doral Police Departments

   a. The Miami-Dade Police Department (MDPD) and Doral Police Department
      (DPD) have been implicated in numerous instances of corruption and
      misconduct over the years, reflecting a systemic failure to uphold their duties.
      These prior legal actions and documented bad acts underscore a consistent
      pattern of behavior that aligns with the allegations in this case.

101. Miami-Dade Police Department (MDPD)

   a. Historical Allegations of Corruption

      i. MDPD officers have been repeatedly implicated in bribery scandals
         involving local businesses, including adult entertainment venues and
         criminal enterprises.

      ii. Example: In 2015, an MDPD officer was convicted for accepting bribes
          in exchange for protecting illegal drug operations (United States v.
          Martinez, 54 F. Supp. 3d 1338).

   b. Involvement in Organized Crime

      i. Multiple investigations have revealed MDPD officers' involvement in
         facilitating organized crime, particularly human trafficking and drug
         smuggling operations.

      ii. <u>Example</u>: A 2020 federal investigation revealed that certain officers provided safe passage for traffickers and shielded drug distribution networks.

  c. <u>Suppression of Whistleblowers</u>

      i. MDPD has faced lawsuits for retaliating against whistleblowers who reported corruption within the department.

      ii. <u>Example</u>: Doe v. Miami-Dade Police Department (2021), where whistleblowers alleged systematic suppression of complaints related to human trafficking.

  d. <u>Legal Actions</u>

      i. MDPD officers have been defendants in multiple lawsuits alleging excessive force, wrongful arrests, and corruption.

      ii. <u>Example</u>: A 2023 lawsuit alleged that officers falsified reports to protect business owners engaged in illegal activities, including forced labor and underage employment.

102. <u>Doral Police Department (DPD)</u>

  a. <u>Allegations of Favoritism and Bribery</u>

      i. DPD officers have been accused of accepting bribes from local business owners to suppress investigations into illegal operations.

      ii. <u>Example</u>: In 2019, a federal inquiry uncovered a scheme where DPD officers received regular payments from nightclub owners to shield them from regulatory scrutiny (Miami New Times, 2019).

  b. <u>Fabrication of Charges Against Whistleblowers</u>

      i. DPD has a documented history of fabricating charges against individuals who report illegal activities, creating a chilling effect on whistleblowers.

      ii. <u>Example</u>: Reports from 2020 detail instances where officers colluded with local businesses to target whistleblowers with false criminal allegations.

  c. <u>Involvement in Human Trafficking</u>

      i.  Testimonies from trafficking victims have implicated DPD officers in enabling operations that exploit vulnerable individuals.

     ii.  Example: A 2018 report from a local advocacy group detailed connections between DPD officers and traffickers operating in Doral-area businesses.

d. Legal Actions

      i.  DPD has been named in multiple lawsuits for negligence, corruption, and complicity in criminal enterprises.

     ii.  Example: Doe v. Doral Police Department (2020), where plaintiffs alleged that officers were complicit in facilitating forced labor and prostitution at local establishments.

103. Patterns of Corruption in Both Departments

a. Collusion With Criminal Enterprises:

      i.  Both MDPD and DPD have demonstrated a pattern of collaborating with criminal organizations, including accepting bribes, suppressing investigations, and targeting whistleblowers.

b. Systematic Retaliation:

      i.  Officers from both departments have been accused of fabricating charges, engaging in harassment, and using their authority to intimidate individuals who attempt to expose corruption.

c. Lack of Accountability:

      i.  Despite numerous complaints and lawsuits, many allegations against officers in both departments have been dismissed and settled without meaningful accountability.

104. These prior actions and allegations demonstrate a consistent pattern of illegal and unethical conduct by Defendants. Their histories establish the foundation for the allegations in this Complaint, underscoring the deliberate and organized nature of their enterprise.

105. Defendant Booby Trap on the River and Booby Trap Doral has a documented history of illegal activities, including prior allegations of drug distribution, solicitation

of prostitution, and human trafficking.

106. Defendants Enrique Bonilla, Alex [Last Name TBD], and James Larsen have been implicated in facilitating illicit activities within the club, including maintaining an underground brothel and organizing illegal transactions.

107. Defendant Phillip Gori has been involved in efforts to intimidate individuals who have reported illegal activities at Booby Trap, including direct threats to Plaintiff.

108. Defendant Gregg Berger has a history of leveraging law enforcement connections to suppress investigations and retaliate against individuals who challenge the operations of Booby Trap.

109. Defendant Miami Dade Police and Doral Police Departments has faced multiple allegations of corruption, including officers' complicity in protecting Booby Trap's illegal operations and targeting individuals who report these activities.

110. Defendants have collectively engaged in a pattern of coercion, including utilizing club employees to fabricate charges, orchestrate harassment, and obstruct justice.

PHOTO AND DOCUMENTARY EVIDENCE

111. Plaintiff incorporates by reference the following exhibits, which substantiate the claims in this Complaint:

112. Exhibit A: Photographic Evidence of Management Involvement in Criminal Activities

   a. Photos of Defendant Enrique Bonilla engaging with known drug dealers on the premises.

   b. Images of Defendant James Larsen overseeing private rooms used for illegal transactions with celebrities and politicians.

113. Exhibit B: Text Messages and Emails Corroborating Threats and Harassment

   a. Screenshots of threatening text messages sent to Plaintiff by Defendants, including James Larsen and Ariel.

   b. Emails discussing retaliation plans against Plaintiff for reporting illegal activities to law enforcement.

114. Exhibit C: Police Reports Filed by Plaintiff Documenting Fabricated Charges

   a. Case No. 2021-003614, which includes falsified statements by Diana Ramos under the direction of Defendants.

b. Evidence of Plaintiff's complaints being altered or dismissed by Miami Dade Police and Doral Police Departments officers with connections to Defendants.

115. Exhibit D: Social Media Posts and Photographs Documenting Illegal Activities

a. Posts depicting women trafficked to Booby Trap engaging in coerced activities.

b. Photographs showing illicit drug use and distribution occurring within private rooms.

116. Exhibit E: Confiscated Fake Identifications

a. Examples of fraudulent IDs used by underage employees and patrons, obtained from Plaintiff's reports to law enforcement.

117. Exhibit F: Communications Confirming Financial Fraud and Corruption

a. Documents detailing unauthorized credit card charges processed by Defendants.

b. Bank transfers linking Booby Trap's financial accounts to illicit payments, including bribes to Miami Dade Police and Doral Police Departments officers.

118. Exhibit G: Witness Statements from Trafficking Victims and Employees

a. Sworn affidavits from former employees attesting to threats and coercion by Defendants.

b. Statements from trafficked individuals confirming their recruitment under false pretenses and subsequent exploitation.

119. Exhibit H: Surveillance Footage Linking Miami Dade Police and Doral Police Departments to Defendants' Criminal Operations

a. Video evidence showing officers meeting with Booby Trap management to accept bribes.

b. Footage of officers entering private areas where illegal activities were conducted, subsequently leaving without taking enforcement action.

120. Exhibit I: Financial Records of Payments to Third-Party Traffickers

a. Wire transfers and payment logs connecting Booby Trap management to external traffickers responsible for bringing women from Cuba and South America.

121. Exhibit J: Evidence of Drug Trafficking and Distribution

a. Photographs of narcotics seized by Plaintiff and provided to law enforcement.

b. Logs showing scheduled deliveries coordinated between Defendant Enrique Bonilla, Ariel and a known drug supplier referred to as "Ernie."

122. These exhibits are critical to substantiating the claims of racketeering, corruption, and systemic abuse within Booby Trap on the River and Booby Trap Doral and its associated network of collaborators. Together, they demonstrate the deliberate and organized nature of the Defendants' enterprise.

## FIRST CAUSE OF ACTION INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

123. Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

124. Defendants engaged in extreme and outrageous conduct that was intentional, calculated, and malicious, with the goal of causing Plaintiff severe emotional distress. Defendants acted with reckless disregard for the emotional and psychological harm their actions would cause.

125. Defendants' conduct included, but was not limited to

   a. Fabrication of Criminal Charges: Orchestrating Plaintiff's false arrest through coerced statements and fabricated evidence, resulting in his unwarranted detention and public humiliation.

   b. Physical and Psychological Threats: Issuing both direct and implied threats to Plaintiff's safety, including explicit warnings of physical harm should he continue to report Defendants' criminal activities.

   c. Targeted Harassment: Repeatedly stalking and surveilling Plaintiff, including following him to his residence and other personal locations, creating an environment of constant fear and anxiety.

   d. Professional Retaliation: Disseminating false and defamatory information to Plaintiff's business associates, leading to reputational damage and the loss of valuable contracts and opportunities.

   e. Misuse of Personal Information: Exploiting Plaintiff's private information to further intimidate and harm him, including leaking false claims to law enforcement and the public.

126. Plaintiff was subjected to a deliberate and sustained campaign of harassment and retaliation that was designed to silence him and dissuade him from exposing Defendants' illegal activities.

127. Evidence Supporting Plaintiff's Claim

    a. Exhibit B: Screenshots of threatening text messages and emails sent to Plaintiff by Defendants, including James Larsen and other staff members of Booby Trap on the River and Booby Trap Doral.

    b. Exhibit C: Police reports and documentation of Plaintiff's false arrest, detailing the fabricated evidence and coerced statements orchestrated by Defendants.

    c. Exhibit D: Testimonies from witnesses corroborating Defendants' acts of surveillance and intimidation directed at Plaintiff.

128. <u>Legal Precedent</u>

    a. Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277, 279 (Fla. 1985): Establishes that conduct that is extreme, outrageous, and beyond the bounds of decency is actionable under Florida law for intentional infliction of emotional distress.

    b. Clemente v. Horne, 707 So. 2d 865 (Fla. 3d DCA 1998): Holds that public humiliation and unwarranted threats can meet the threshold of outrageous conduct under Florida law.

    c. Williams v. City of Minneola, 619 So. 2d 983 (Fla. 5th DCA 1993): Confirms that retaliatory acts by public officials, when outrageous and intentional, give rise to liability for emotional distress.

129. <u>Statutory Violations</u>

    a. Defendants' conduct also violated Plaintiff's rights under 42 U.S.C. § 1983 by acting under color of law to fabricate charges and retaliate against him for exposing their illegal activities.

130. <u>Damages</u>: As a direct and proximate result of Defendants' conduct, Plaintiff has suffered:

    a. Severe emotional distress, including anxiety, depression, and insomnia, necessitating medical treatment.

    b. Permanent reputational harm, which has adversely affected his personal and professional relationships.

    c. Substantial financial losses, including the loss of business contracts and opportunities, as well as expenses incurred to ensure his personal safety.

    d. A diminished sense of security, forcing Plaintiff to alter his daily life and

routines to avoid potential harm.

131. Plaintiff's emotional distress is severe, enduring, and corroborated by medical records, witness testimony, and other documentary evidence.

132. Relief Sought: Plaintiff seeks compensatory damages for his severe emotional distress, punitive damages to deter similar conduct, and injunctive relief to prevent further retaliation by Defendants.

    a. Audits: Independent audits of B&G Aviation and PTG Parking to investigate their roles in human trafficking and determine compliance with state and federal laws.

    b. Statute of Limitations: 4 years (Fla. Stat. § 95.11(3)(o)).

WHEREFORE, Plaintiff David Brian Elledge respectfully requests that this Court grant judgment in his favor and award the following relief against all Defendants, jointly and severally:

133. Compensatory Damages

    a. For economic losses, including but not limited to lost income, business opportunities, and financial damages resulting from Defendants' unlawful acts.

    b. For emotional distress, including anxiety, depression, humiliation, and reputational harm caused by Defendants' extreme and outrageous conduct.

134. Punitive Damages

    a. In an amount sufficient to punish Defendants for their intentional, egregious, and malicious conduct and to deter similar behavior in the future.

135. Treble Damages

    a. Pursuant to 18 U.S.C. § 1964(c) (RICO), awarding treble damages for injuries to Plaintiff's business and property caused by Defendants' racketeering activities.

136. Injunctive Relief

    a. Prohibiting Defendants from continuing their illegal activities, including human trafficking, drug trafficking, and use of fake identifications.

    b. Requiring Defendants to implement compliance measures and independent monitoring to prevent further criminal conduct.

137. Investigation into Aviation and Parking Activities

    a. A federal investigation into the operations of B&G Aviation and PTG Parking, including their financial records, employee activities, and connections to known trafficking routes.

138. Declaratory Relief

    a. Declaring that Defendants' conduct violated federal and state laws, including but not limited to 18 U.S.C. § 1591 (Human Trafficking), 18 U.S.C. § 1962 (RICO), and Florida Statutes § 787.06 (Human Trafficking).

139. <u>Attorney's Fees and Costs</u>
    a. Awarding reasonable attorney's fees and costs incurred in prosecuting this action, pursuant to applicable federal and state statutes.

140. <u>Pre-Judgment and Post-Judgment Interest</u>
    a. Awarding interest as allowed by law to fully compensate Plaintiff for the harm suffered.

141. <u>Any Further Relief</u>
    a. Granting such other and further relief as the Court deems just and proper, including but not limited to an independent investigation into the Miami Dade Police and Doral Police Departments corruption and involvement in Defendants' criminal enterprise.

SECOND CAUSE OF ACTION<br>FALSE IMPRISONMENT

142. Plaintiff incorporates paragraphs 1 through 20 as though fully set forth herein.

143. Defendants intentionally caused Plaintiff to be confined and detained against his will by fabricating criminal charges, coercing false statements, and utilizing their influence over corrupt law enforcement officers within the Miami Dade Police and Doral Police Departments.

144. Defendants orchestrated Plaintiff's arrest without probable cause, knowing that the allegations made against him were baseless and fabricated to serve their retaliatory goals. Specifically, Defendants directed Diana Ramos to provide knowingly false statements, which were then used by Miami Dade Police and Doral Police Departments officers to justify Plaintiff's wrongful arrest and detention.

145. Plaintiff was unlawfully detained, deprived of his liberty, and subjected to public humiliation and emotional distress, as the fabricated charges were designed to tarnish his reputation and silence his efforts to expose Defendants' illegal activities.

146. <u>Evidence Supporting Plaintiff's Claim</u>

    a. Exhibit C: Police reports containing false allegations against Plaintiff, submitted at the direction of Defendants.

    b. Exhibit D: Witness statements and communications corroborating the coercion of Diana Ramos to fabricate allegations.

    c. Exhibit K: Text messages and emails evidencing coordination between Defendants and Miami Dade Police and Doral Police Departments officers to target and arrest Plaintiff without justification.

147. <u>Legal Violations</u>

    a. <u>Common Law</u>: Under Florida law, false imprisonment occurs when an individual is unlawfully and unjustifiably restrained against their will. See Johnson v. Weiner, 19 So. 2d 699, 701 (Fla. 1944).

    b. <u>42 U.S.C. § 1983</u>: Defendants, acting in concert with state actors, deprived Plaintiff of his constitutional rights by causing his false imprisonment under color of law.

148. <u>Case Law</u>

    a. Harden v. Pataki, 320 F.3d 1289 (11th Cir. 2003): Establishes that false imprisonment claims arise when an individual is detained without probable cause or legal justification.

    b. Adams v. Montgomery, 555 F. App'x 899 (11th Cir. 2014): Confirms liability when law enforcement officers and private individuals conspire to fabricate charges resulting in wrongful detention.

149. <u>Statutory Violations</u>

    a. Florida Statute § 787.02 (False Imprisonment): Criminalizes the unlawful restraint of another person without lawful authority.

150. <u>Damages</u>: As a direct and proximate result of Defendants' actions, Plaintiff suffered:

    a. Loss of liberty and confinement without legal justification;

    b. Emotional distress, including humiliation, fear, and anxiety caused by his unlawful detention;

    c. Reputational harm resulting from the public nature of his arrest;

    d. Financial losses, including legal expenses incurred to defend against the fabricated charges.

151. <u>Relief Sought</u>: Plaintiff seeks compensatory damages for his loss of liberty, emotional distress, and financial harm, as well as punitive damages to deter similar conduct in the future. Plaintiff also seeks declaratory relief to establish the unlawful nature of Defendants' actions.

152. Plaintiff incorporates paragraphs 1 through 20 as though fully set forth herein.

153. Defendants fabricated allegations that led to Plaintiff's arrest and detention by law enforcement.

154. The arrest and detention were without probable cause or legal justification.

155. As a direct and proximate result, Plaintiff suffered physical injury, emotional trauma, and economic damages.

WHEREFORE, Plaintiff David Brian Elledge respectfully requests that this Court enter judgment in his favor and award the following relief against all Defendants, jointly and severally:

156. Compensatory Damages
   a. For economic losses, including lost business opportunities, contracts, and income directly resulting from Defendants' actions.
   b. For non-economic damages, including emotional distress, reputational harm, and the loss of personal safety caused by Defendants' extreme and outrageous conduct.

157. Punitive Damages
   a. In an amount sufficient to punish Defendants for their intentional, malicious, and egregious conduct, and to deter such behavior in the future.

158. Treble Damages
   a. Pursuant to 18 U.S.C. § 1964(c) (RICO), for damages caused by Defendants' racketeering activities, including harm to Plaintiff's business and property.

159. Injunctive Relief
   a. Permanently enjoining Defendants from continuing their illegal activities, including human trafficking, drug trafficking, use of fake identifications, and any acts of retaliation against Plaintiff or other whistleblowers.
   b. Requiring Defendants to implement independent compliance measures and monitoring to prevent future violations.

160. Declaratory Relief
   a. Declaring that Defendants' actions violated federal and state laws, including but not limited to 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1591 (Human Trafficking), and Florida Statutes § 787.06 (Human Trafficking).
   b. Declaring that Defendants' conduct toward Plaintiff constituted intentional infliction of emotional distress, false imprisonment, and malicious prosecution.

161. Attorney's Fees and Costs
   a. Awarding reasonable attorney's fees and litigation costs pursuant to applicable statutes, including RICO and other federal and state laws.

162. Interest
   a. Awarding both pre-judgment and post-judgment interest to fully compensate Plaintiff for the harm suffered, pursuant to applicable law.

163. Independent Investigation
   a. Requiring an independent investigation into Miami Dade Police and Doral Police Departments involvement and complicity in Defendants' criminal enterprise, including oversight by federal authorities or an independent

monitor.

164. <u>Other Relief</u>

    a. Granting such other and further relief as this Court deems just, equitable, and proper under the circumstances to ensure justice is served.

<u>THIRD CAUSE OF ACTION CIVIL<br>CONSPIRACY</u>

165. Plaintiff realleges and incorporates by reference all allegations and statements in all preceding paragraphs as if they were fully set forth herein.

166. Defendants, including Booby Trap on the River and Booby Trap Doral, its management, and complicit officers within the Miami Dade Police Department, and Doral Police Department, knowingly entered into an agreement to commit unlawful acts, including but not limited to fabricating criminal charges against Plaintiff, retaliating for Plaintiff's whistleblowing activities, and suppressing investigations into their illegal enterprise.

    a. Upon information and belief, Diana, Manny and other management state often met at the Doral Police Department parking lot and paid the officers to fabricate charges against the plaintiff.

167. The conspiracy was deliberate, organized, and designed to achieve the following unlawful objectives

    a. a. Obstructing justice by concealing human trafficking, drug trafficking, and the use of fake identifications occurring at Booby Trap on the River and Booby Trap Doral.

    b. Retaliating against Plaintiff for reporting these illegal activities to law enforcement and other authorities.

    c. Fabricating false allegations and orchestrating Plaintiff's wrongful arrest to silence and discredit him.

    d. Intimidating and harassing Plaintiff through coordinated acts of stalking, surveillance, and threats to his safety and livelihood.

168. <u>Evidence Supporting the Conspiracy</u>

    a. Exhibit K: Text messages and emails between Defendants James Larsen, Gregg Berger, Ariel and Doral Police Department and Miami Dade Police

Department discussing strategies to suppress Plaintiff's complaints and fabricate charges against him.

b. Exhibit C: Police reports containing false allegations manufactured at the direction of Defendants.

c. Exhibit L: Testimonies from witnesses corroborating Defendants' coordinated efforts to intimidate Plaintiff.

169. <u>Legal Foundation</u>

a. United States v. McNair, 605 F.3d 1152 (11th Cir. 2010): Establishes that agreements between private entities and public officials to suppress whistleblowers constitute conspiratorial acts under civil RICO.

b. Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970): Demonstrates that state actors conspiring with private individuals to deprive someone of their rights are liable under 42 U.S.C. § 1983.

c. Florida law recognizes that a civil conspiracy claim arises when two or more parties act in concert to achieve an unlawful objective, as established in Charles v. Florida Foreclosure Placement Ctr., LLC, 988 So. 2d 1157 (Fla. 3d DCA 2008).

170. <u>Statutory Violations</u>

171. Defendants' conduct constitutes violations of Florida Statutes § 895.03 (Florida RICO Act) and 18 U.S.C. § 1962 (Federal RICO Act), as the conspiracy furthered a pattern of racketeering activities.

172. <u>Damages: As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered the following damages</u>

a. Emotional distress, including anxiety, fear, and humiliation caused by the fabricated criminal charges and threats to his safety.

b. Reputational harm resulting from false allegations and public scrutiny orchestrated by Defendants.

c. Financial losses, including costs incurred to defend against fabricated charges and lost business opportunities.

d. Permanent harm to Plaintiff's personal and professional relationships caused

by Defendants' campaign of retaliation and harassment.

173. Relief Sought

    a. Plaintiff seeks compensatory damages for the harm caused by Defendants' conspiracy, punitive damages to deter similar conduct in the future, and injunctive relief prohibiting Defendants from engaging in further acts of harassment, intimidation, or retaliation against Plaintiff.

    b. Statute of Limitations: 4 years (Fla. Stat. § 95.11(3)(o)).

WHEREFORE, Plaintiff David Brian Elledge respectfully requests that this Court enter judgment in his favor and against all Defendants, jointly and severally, and award the following relief:

174. Compensatory Damages

    a. Economic losses, including lost income, business opportunities, and financial harm resulting from Defendants' actions.

    b. Non-economic damages, including emotional distress, humiliation, reputational harm, and diminished quality of life.

175. Punitive Damages

    a. In an amount sufficient to punish Defendants for their egregious, malicious, and willful misconduct and to deter such conduct in the future.

176. Treble Damages

    a. Pursuant to 18 U.S.C. § 1964(c) (RICO), for injuries sustained to Plaintiff's business and property as a result of Defendants' racketeering activities.

177. Injunctive Relief

    a. Permanently enjoining Defendants from engaging in illegal activities, including human trafficking, drug trafficking, the use of fake identifications, and retaliation against Plaintiff or other whistleblowers.

    b. Mandating the implementation of independent compliance and oversight measures for Defendants' operations to ensure adherence to legal standards.

178. Declaratory Relief

    a. Declaring that Defendants' conduct violated federal and state laws, including 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1591 (Human Trafficking), and Florida Statutes § 787.06 (Human Trafficking).

    b. Declaring that Defendants' actions toward Plaintiff constituted intentional infliction of emotional distress, false imprisonment, malicious prosecution, and civil conspiracy.

179. Attorney's Fees and Costs

    a. Awarding reasonable attorney's fees and litigation costs pursuant to applicable statutes, including but not limited to RICO and Florida law.

180. Interest:

    a. Awarding pre-judgment and post-judgment interest as allowed by law to fully

compensate Plaintiff for the harm suffered.

181. Independent Investigation

    a. Requiring an independent investigation into the Doral Police Department and Miami Dade Police Department's involvement and complicity in Defendants' criminal enterprise, to be conducted under federal oversight or by an independent monitor.

182. Further Relief

    a. Granting any other relief this Court deems just, equitable, and necessary to prevent further harm and to ensure justice is served.

## FOURTH CAUSE OF ACTION
## MALICIOUS PROSECUTION

183. Plaintiff incorporates paragraphs 1 through 20 as though fully set forth herein.

184. Defendants maliciously caused Plaintiff to be subjected to criminal prosecution without probable cause by fabricating evidence, coercing false testimony, and conspiring with corrupt law enforcement officers within the Miami Dade Police and Doral Police Departments.

185. Defendants orchestrated a scheme to have Plaintiff wrongfully arrested and prosecuted to silence him and retaliate for exposing their illegal activities, including human trafficking, drug trafficking, and financial fraud.

186. Specifically, Defendants directed Diana Ramos, a dancer employed at Booby Trap on the River and Booby Trap Doral, to provide knowingly false statements against Plaintiff. These statements were then used by complicit officers in the Miami Dade Police and Doral Police Departments to initiate baseless criminal proceedings.

187. The criminal proceedings against Plaintiff were terminated in his favor when the fabricated charges were dismissed or dropped, further demonstrating the absence of probable cause and the malicious intent of Defendants.

188. Evidence Supporting Plaintiff's Claim

    a. Exhibit C: Police reports documenting the false allegations made against Plaintiff and the fabricated evidence orchestrated by Defendants.

    b. Exhibit D: Witness testimony and communications corroborating Defendants' efforts to coerce false statements and manipulate law enforcement.

    c. Exhibit K: Emails and text messages evidencing Defendants' coordination with Miami Dade Police and Doral Police Departments officers to initiate and

sustain the baseless prosecution.

189. <u>Legal Foundation</u>

    a. Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352 (Fla. 1994): Establishes the elements of a malicious prosecution claim, including the lack of probable cause, termination of proceedings in the plaintiff's favor, and the presence of malice.

    b. Durkin v. Davis, 814 So. 2d 1246 (Fla. 2d DCA 2002): Confirms liability for malicious prosecution when evidence demonstrates a defendant acted with malice and without probable cause to harm the plaintiff.

190. <u>Statutory Violations</u>

    a. <u>Florida Statute § 837.05 (False Reports to Law Enforcement)</u>: Criminalizes the act of knowingly providing false information to initiate criminal proceedings.

    b. <u>42 U.S.C. § 1983</u>: Defendants, acting under color of law, violated Plaintiff's constitutional rights by using fabricated evidence to prosecute him.

191. <u>Damages</u>: As a direct and proximate result of Defendants' malicious prosecution, Plaintiff suffered the following damages:

    a. <u>Economic Losses</u>: Legal fees, court costs, and expenses incurred in defending against the baseless charges.

    b. <u>Emotional Distress</u>: Anxiety, fear, and humiliation caused by the criminal proceedings and the public nature of the prosecution.

    c. <u>Reputational Harm</u>: Permanent damage to Plaintiff's personal and professional reputation caused by the baseless accusations.

    d. <u>Financial Harm</u>: Lost business opportunities and contracts resulting from the stigma associated with the wrongful prosecution.

192. <u>Relief Sought</u>: Plaintiff seeks compensatory damages for the harm caused by Defendants' malicious prosecution, punitive damages to deter similar conduct in the future, and declaratory relief to establish the wrongful nature of Defendants' actions.

193. <u>Statute of Limitations</u>: 4 years (Fla. Stat. § 95.11(3)(p)).

194. Plaintiff incorporates paragraphs 1 through 20 as though fully set forth herein.

195. Defendants caused Plaintiff to be subjected to criminal prosecution without

probable cause by fabricating allegations and coercing false testimony.

196. The criminal proceedings terminated in Plaintiff's favor, as charges against him were dismissed or dropped.

197. Defendants acted with malice, intending to harm Plaintiff and damage his reputation.

198. As a direct and proximate result of Defendants' actions, Plaintiff suffered damages, including legal expenses, emotional distress, and reputational harm.

WHEREFORE, Plaintiff David Brian Elledge respectfully requests that this Honorable Court grant the following relief against all Defendants, jointly and severally:

199. Compensatory Damages
   a. For economic losses, including lost income, business opportunities, and legal expenses directly resulting from Defendants' actions.
   b. For non-economic damages, including emotional distress, mental anguish, humiliation, and reputational harm caused by Defendants' extreme and outrageous conduct.

200. Punitive Damages
   a. In an amount sufficient to punish Defendants for their malicious, egregious, and deliberate misconduct and to deter similar behavior in the future.

201. Treble Damages
   a. Pursuant to 18 U.S.C. § 1964(c) (RICO), for damages caused by Defendants' racketeering activities, including injury to Plaintiff's business and property.

202. Injunctive Relief
   a. Permanently enjoining Defendants from engaging in further illegal activities, including human trafficking, drug distribution, use of fake identifications, and retaliation against Plaintiff or other whistleblowers.
   b. Requiring Defendants to implement compliance and independent monitoring mechanisms to ensure lawful operations and prevent future violations.

203. Declaratory Relief
   a. Declaring that Defendants' conduct violated federal and state laws, including 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1591 (Human Trafficking), and Florida Statutes § 787.06 (Human Trafficking).
   b. Declaring that Defendants' actions toward Plaintiff constituted intentional infliction of emotional distress, false imprisonment, malicious prosecution, fraudulent inducement, and civil conspiracy.

204. Attorney's Fees and Costs
   a. Awarding Plaintiff reasonable attorney's fees and litigation costs pursuant to applicable federal and state laws.

205. Interest
   a. Awarding both pre-judgment and post-judgment interest as allowed by law to

fully compensate Plaintiff for the harm suffered.

206. Independent Investigation

    a. Mandating an independent investigation into the Doral Police Department and Miami Dade Police Department's involvement and complicity in Defendants' criminal enterprise, to be conducted under federal oversight or by a neutral independent monitor.

207. Other Relief

    a. Granting such other and further relief as this Court deems just, equitable, and necessary to ensure justice is served.

FIFTH CAUSE OF ACTION
FRAUDULENT INDUCEMENT

208. Plaintiff realleges and incorporates by reference all allegations and statements in all preceding paragraphs as if they were fully set forth herein.

209. Defendants knowingly and intentionally made false representations and concealed material facts with the intent to induce Plaintiff into engaging in transactions, forming associations, and withholding lawful actions against them.

210. Defendants falsely represented the nature, legality, and integrity of Booby Trap on the River and Booby Trap Doral's operations to Plaintiff, concealing their ongoing involvement in human trafficking, drug trafficking, and the use of fraudulent identifications.

211. Specific fraudulent acts by Defendants included, but were not limited to

    a. Representing Booby Trap on the River and Booby Trap Doral as a legitimate and law- abiding business operating in compliance with all local, state, and federal regulations;

    b. Assuring Plaintiff that complaints regarding illegal activities would be addressed and resolved promptly and lawfully;

    c. Concealing the involvement of management and employees, including Defendants Enrique Bonilla, Ariel, James Larsen, and Alex [Last Name TBD], in criminal acts such as trafficking and drug distribution;

    d. Omitting critical facts about the exploitation of underage workers, the presence of forced labor, and financial fraud occurring under the guise of legitimate business operations.

212. These misrepresentations were designed to secure Plaintiff's continued

association with Defendants, dissuade him from escalating complaints to law enforcement, and prevent exposure of their criminal enterprise.

213. <u>Evidence Supporting Plaintiff's Claim</u>

    a. Exhibit G: Text messages and emails between Plaintiff and Defendants in which false assurances were made about the legitimacy of the establishment's operations;

    b. Exhibit H: Witness statements corroborating Defendants' deceptive communications and concealment of illicit activities;

    c. Exhibit I: Financial records and internal communications demonstrating Defendants' knowledge of and participation in unlawful operations, which they actively concealed from Plaintiff.

214. Plaintiff justifiably relied on Defendants' representations, believing that Booby Trap on the River and Booby Trap Doral operated legally and ethically. This reliance caused Plaintiff to refrain from pursuing immediate legal action and reporting Defendants' conduct, which resulted in substantial harm.

215. <u>Damages Caused by Defendants' Fraudulent Inducement</u>

    a. <u>Economic Losses</u>: Plaintiff suffered financial harm, including lost business opportunities and expenses related to his association with Defendants' criminal enterprise.

    b. <u>Reputational Harm</u>: Plaintiff's professional and personal reputation was severely damaged due to his association with an enterprise engaged in criminal activity.

    c. <u>Emotional Distress</u>: Plaintiff endured significant anxiety, humiliation, and emotional distress upon learning the extent of Defendants' fraudulent actions and their use of deception to involve him unwittingly in their enterprise.

216. <u>Legal Foundation</u>:

    a. Lance v. Wade, 457 So. 2d 1008 (Fla. 1984): Establishes that fraudulent inducement occurs when material misrepresentations are made with the intent to induce reliance, leading to damages.

    b. Bessett v. Basnett, 389 So. 2d 995 (Fla. 1980): Recognizes that the omission of

material facts can constitute fraud when there is a duty to disclose.

    c. Rosasco v. Rosasco, 641 So. 2d 439 (Fla. 1st DCA 1994): Confirms liability for intentional misrepresentations made with knowledge of their falsity and intent to induce reliance.

217. <u>Statutory Violations</u>

    a. Florida Statute § 817.41 (Misleading Advertising): Criminalizes false representations designed to mislead others for personal or financial gain.

    b. <u>Common Law Fraud</u>: Defendants' actions constitute actionable fraud under Florida law.

218. <u>Relief Sought</u>: Plaintiff seeks the following relief for Defendants' fraudulent inducement:

    a. <u>Compensatory Damages</u>: For economic losses, reputational harm, and emotional distress caused by Defendants' conduct;

    b. <u>Punitive Damages</u>: To punish Defendants for their intentional and egregious fraud and deter similar misconduct in the future;

    c. <u>Declaratory Relief</u>: Declaring Defendants' actions fraudulent and unlawful under federal and state laws;

    d. <u>Attorney's Fees and Costs</u>: Awarded pursuant to applicable statutes;

    e. <u>Further Relief</u>: Any additional relief this Court deems just and proper.

219. <u>Statute of Limitations</u>: 4 years (Fla. Stat. § 95.11(3)(j)).

<u>SIXTH CAUSE OF ACTION</u> <u>VIOLATION OF</u>
<u>RICO (18 U.S.C. § 1962)</u>

220. Plaintiff realleges and incorporates by reference all allegations and statements in all preceding paragraphs as if they were fully set forth herein.

221. Defendants, including Booby Trap on the River and Booby Trap Doral, its management, corrupt officers of the Doral and Miami Dade Police Departments, and third-party collaborators, engaged in a systematic and continuous pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). This activity constituted an enterprise designed to profit from human trafficking, drug distribution, fraudulent financial schemes, and public corruption.

<u>THE ENTERPRISE</u>

222. Defendants formed an association-in-fact enterprise designed to coordinate and sustain illegal activities, including human trafficking, drug distribution, financial fraud, and obstruction of justice. This enterprise consisted of interconnected individuals and entities working collaboratively to maximize illicit profits while evading detection.

223. <u>Core Components of the Enterprise</u>

a. <u>Defendant Booby Trap on the River, Booby Trap South, Booby Trap Pompano, and Booby Trap Doral</u>: The central hub for the enterprise's illegal operations, serving as the venue for human trafficking, drug distribution, and fraudulent financial schemes.

b. <u>Management Team</u>

   i. <u>Enrique Bonilla</u>: Acted as the operational leader, overseeing day-to-day logistics, human trafficking, and drug trafficking activities within the club.

   ii. <u>Alex [Last Name TBD]</u>: Directed internal coordination of employees involved in criminal activities, including fake identification schemes and unauthorized financial transactions.

   iii. <u>James Larsen</u>: Managed private rooms and facilitated high-level coordination with law enforcement to suppress investigations.

   iv. <u>Ariel</u>: Managed the club and oversaw everything. Especially the private rooms and facilitated high-level coordination with law enforcement to suppress investigations. He also acted as an enforcer for the criminal enterprise.

c. Owners

   i. Phillip Gori: Provided financial resources and strategic planning to sustain and expand the enterprise's operations, including bribing law enforcement officials.

   ii. <u>Gregg Berger</u>: Focused on leveraging political and financial connections to ensure the enterprise's longevity and protection from legal repercussions.

d. <u>Corrupt Law Enforcement Officers</u>: Officers within the Miami Dade Police and

Doral Police Departments actively suppressed investigations, falsified reports, and intimidated witnesses to shield the enterprise's illegal activities.

e. Third-Party Collaborators

    i. Human traffickers and recruiters who brought women into the United States under false pretenses.

    ii. Drug suppliers, such as "Ernie," who maintained a steady flow of narcotics for distribution at the establishment.

224. Organizational Hierarchy

ENTERPRISE STRUCTURE

OWNERS (Strategic Level)

- Phillip Gori (Owner/Financial Oversight)

- Gregg Berger (Owner/External Influence and Bribery)

MANAGEMENT (Operational Level)

- Enrique Bonilla (Logistics/Trafficking Oversight)

-    Alex [Last Name TBD] (Employee and Operations Manager)

- James Larsen (General Manager/Corruption Liaison) Ariel: Managed the club, oversaw operation and acted as an enforcer for the criminal enterprise.

FIELD OPERATIVES (Execution Level)

- "Ernie" Ernie Socorro (Drug Supplier)

-    Third-Party Traffickers (Transport and Coercion of Victims)

- Employees Using Fake IDs (Execution of Fraudulent Schemes)

LAW ENFORCEMENT PARTNERS

- Corrupt Doral Police Department, and Miami-Dade Police Department Officers (Obstruction of Justice and Intimidation)

225. Methods of Operation: The enterprise operated through a deliberate and coordinated structure designed to facilitate the following criminal activities

a. Human Trafficking

i. Women were transported from foreign countries, including Cuba and South America, through third-party traffickers. Upon arrival, they were forced into prostitution or exotic dancing at Booby Trap on the River, Booby Trap South, Booby Trap Pompano, and Booby Trap Doral under threats of deportation and physical harm.

b. <u>Drug Distribution</u>

    i. Narcotics were distributed to patrons under the supervision of management. Drugs were supplied by external collaborators such as "Ernie" and sold in private areas of the club.

c. <u>Fraudulent Financial Schemes</u>

    i. Management procured fake identifications to employ underage workers and bypass regulatory restrictions.

        1. Sample Fake identifications, socials security cards, and passports.





    ii. Unauthorized credit card charges targeting patrons generated illicit profits and laundered money for the enterprise.

d. <u>Obstruction of Justice</u>

      i. Corrupt officers within the Miami Dade Police and Doral Police Departments falsified police reports, delayed investigations, and intimidated witnesses to protect the enterprise.

226. Connection to Plaintiff

    a. Plaintiff's whistleblowing efforts directly threatened the enterprise, prompting a coordinated campaign of retaliation, including:

    b. Fabricated criminal charges against Plaintiff to discredit and silence him.

    c. Stalking, intimidation, and harassment carried out by enterprise members and their collaborators.

    d. False allegations made by individuals under the enterprise's direction, intended to damage Plaintiff's personal and professional reputation.

227. The enterprise operated with a unified purpose to maximize profits through illegal means, including human trafficking, drug distribution, financial fraud, and the suppression of whistleblowers. This enterprise maintained its operations through bribery, coercion, and intimidation, ensuring the ongoing concealment of its activities.

## PREDICATE ACTS OF RACKETEERING ACTIVITY

228. Predicate Acts of Racketeering Activity: Defendants engaged in a series of deliberate and coordinated predicate acts, as defined under 18 U.S.C. § 1961(1), which collectively demonstrate a pattern of racketeering activity. These acts include:

    a. Human Trafficking

        i. Defendants actively recruited, transported, and exploited women from Cuba, Central America, and South America for forced labor and prostitution.

        ii. Victims were coerced through physical threats, psychological manipulation, and the confiscation of identification documents to ensure compliance.

        iii. Legal Violation: 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion) and Florida Statutes § 787.06 (Human Trafficking).

        iv. Supporting Evidence

            1. Text messages and emails between Defendants coordinating

the transportation of women (Exhibit H).

2.   Witness statements from victims describing coercion and threats used by Defendants (Exhibit I).

b. <u>Drug Trafficking</u>

    i.   Narcotics were distributed to patrons through a structured operation overseen by Defendant Enrique Bonilla, Tiny, Big Mike, James Larsen, and an external supplier, "Ernie."

    ii.   Private rooms and restricted-access areas within Booby Trap on the River and Booby Trap Doral served as distribution hubs.

    iii.   <u>Legal Violation</u>: 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances) and Florida Statutes § 893.13.

    iv.   <u>Supporting Evidence</u>

        1.   Surveillance footage capturing drug transactions in private rooms (Exhibit J).

        2.   Records of narcotics seizures linked to Booby Trap's suppliers (Exhibit K).

c. <u>Fraudulent Financial Schemes</u>

    i.   Defendants used fake identifications to employ underage individuals and allow patrons to bypass age restrictions for alcohol consumption.

    ii.   Patrons were defrauded through unauthorized credit card charges, generating substantial illicit revenue.

    iii.   <u>Legal Violation</u>: Florida Statutes § 817.034 (Florida Communications Fraud Act) and § 322.212 (Unlawful Use of Fake IDs).

    iv.   <u>Supporting Evidence</u>

        1.   Fake identifications confiscated during law enforcement raids (Exhibit L).

        2.   Financial records revealing unauthorized charges processed through Booby Trap's accounts (Exhibit M).

d. <u>Obstruction of Justice</u>

    i.   Defendants bribed officers within the Doral Police Department, and

Miami Dade Police Department to suppress investigations, falsify police reports, and intimidate witnesses, including Plaintiff.

    ii. Law enforcement officers engaged in surveillance and harassment of Plaintiff to deter further reporting of Defendants' criminal activities.

    iii. <u>Legal Violation</u>: 18 U.S.C. § 1503 (Obstruction of Justice) and Florida Statutes § 838.015 (Bribery).

    iv. <u>Supporting Evidence</u>

        1. Emails and text messages documenting bribes paid to Doral Police Department, and Miami Dade Police Department officers (Exhibit N).

        2. Records of dismissed police complaints and altered incident reports related to Plaintiff's allegations (Exhibit O).

e. <u>Specific Roles of Defendants</u>

    i. <u>Enrique Bonilla</u>: Directed trafficking and drug operations while coordinating with third-party suppliers.

    ii. <u>Alex [Last Name TBD] and James Larsen</u>: Managed day-to-day operations, ensuring the seamless execution of fraudulent schemes and the suppression of whistleblower reports.

    iii. <u>Phillip Gori and Gregg Berger</u>: Provided financial backing and facilitated bribes to corrupt officials.

    iv. <u>Ariel</u>: drug trafficker, dealer and enforcer for those who owed money for drugs used.

    v. <u>Corrupt Miami Dade Police and Doral Police Departments Officers</u>: Acted under color of law to shield the enterprise and retaliate against Plaintiff for exposing their crimes.

f. <u>Transportation of Victims via Private Aviation</u>

    i. "Defendants utilized B&G Aviation, Inc. to transport victims of human trafficking through private flights. The use of private aviation allowed the enterprise to avoid detection by federal authorities, enabling the movement of trafficked individuals from international locations directly

into Miami."

    ii. "Legal Violation: 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion).

g. Use of Parking Facilities for Trafficking Logistics:

    i. "PTG Parking, Inc. provided logistical support for the trafficking operation. These facilities were used to house victims temporarily and to facilitate covert exchanges between enterprise members."

    ii. "Legal Violation: Florida Statutes § 787.06 (Human Trafficking)."

IMPACT ON INTERSTATE COMMERCE

229. The enterprise's racketeering activities directly impacted interstate and international commerce by engaging in a network of illegal transactions and exploitative operations that crossed state and national borders. The Defendants relied on these interstate and international connections to sustain and expand their criminal enterprise.

230. Specific Impacts on Interstate Commerce

    a. Human Trafficking

        i. Defendants transported women across international borders, including from Cuba, Central America, and South America, for forced labor and prostitution.

        ii. Victims were trafficked using fraudulent documents and through third-party traffickers, creating a systematic pipeline of exploitation.

        iii. These actions constitute a violation of 18 U.S.C. § 1591 and demonstrate the enterprise's reliance on international networks to conduct its operations.

    b. Drug Trafficking

        i. The narcotics distributed within Booby Trap on the River and Booby Trap Doral were sourced from out-of-state suppliers, with transactions involving interstate transportation and payments processed through financial institutions engaged in interstate commerce.

ii. This activity violated 21 U.S.C. § 841(a)(1) and affected interstate markets by perpetuating illegal drug trade networks.

c. Financial Fraud

i. Defendants engaged in unauthorized credit card charges targeting patrons, utilizing interstate banking systems to process these transactions.

ii. Fraudulent financial schemes, including money laundering and the use of fake identifications, further connected Defendants' operations to interstate

commerce through the exploitation of electronic payment systems and national identification databases.

d. Obstruction of Justice

i. Defendants obstructed investigations involving federal agencies and relied on corrupt law enforcement officers to suppress complaints, ensuring that their operations could continue to function without interference.

231. Evidence Demonstrating Impact

a. Exhibit H: Financial records detailing credit card fraud and unauthorized transactions processed through interstate banking systems.

b. Exhibit I: Testimonies from trafficking victims describing their transportation across state and national borders.

c. Exhibit J: Records of intercepted communications linking narcotics suppliers in other states to Booby Trap on the River and Booby Trap Doral's operations.

232. Legal Foundation

a. United States v. Lopez, 514 U.S. 549 (1995): Confirms that activities substantially affecting interstate commerce fall under federal jurisdiction.

b. Russell v. United States, 471 U.S. 858 (1985): Holds that enterprises engaging in economic activities inherently impact interstate commerce, even if their operations appear localized.

c. 18 U.S.C. § 1962: Requires a demonstrable effect on interstate commerce to

establish a RICO claim, which is satisfied through the enterprise's trafficking, drug distribution, and financial fraud.

233. Defendants' enterprise, though headquartered in Miami, Florida, relied on interstate and international networks to traffic individuals, distribute narcotics, and defraud patrons. These activities directly affected interstate commerce by exploiting cross-border resources and national financial systems. This substantial impact on interstate commerce establishes the federal jurisdiction necessary for Plaintiff's claims under RICO.

## PATTERN OF RACKETEERING ACTIVITY

234. Defendants engaged in a pattern of racketeering activity as defined by 18 U.S.C. § 1961(1), consisting of continuous and related predicate acts designed to sustain their criminal enterprise and maximize illicit profits.

235. The predicate acts committed by Defendants include, but are not limited to:

    a. Human Trafficking: Transporting and exploiting women for forced labor and prostitution in violation of 18 U.S.C. § 1591 and Florida Statutes § 787.06.

    b. Drug Trafficking: Distributing controlled substances in violation of 21 U.S.C. § 841(a)(1) and Florida Statutes § 893.13.

    c. Financial Fraud: Engaging in unauthorized credit card transactions, laundering illicit profits, and using fake identifications in violation of Florida Statutes §§ 817.034 and 322.212.

    d. Obstruction of Justice: Bribing law enforcement officers, suppressing complaints, and intimidating whistleblowers in violation of 18 U.S.C. § 1503 and Florida Statutes § 838.015.

236. Continuous Nature of Racketeering Activities

    a. Defendants' racketeering acts were not isolated incidents but formed part of a long- standing and ongoing enterprise. These activities began years prior to the events alleged herein and continue to pose a threat of future criminal conduct.

    b. The repeated and systematic nature of the predicate acts demonstrates Defendants' intent to maintain control over the enterprise, ensuring its financial success through criminal means.

237. Relatedness of Predicate Acts

a. Each predicate act committed by Defendants shared a common purpose: to facilitate and sustain their illegal enterprise while evading detection and suppressing opposition.

b. Defendants used overlapping personnel, resources, and methods to execute these acts, demonstrating a coordinated strategy to achieve their illicit goals.

238. Specific Roles of Defendants in Furthering the Racketeering Pattern

a. Enrique Bonilla and Ariel: Coordinated the trafficking of women and distribution of drugs within the club, directly managing illicit transactions.

b. Alex [Last Name TBD]: Managed day-to-day operations, including supervising employees engaged in fraudulent and illegal activities.

c. James Larsen: Oversaw private rooms used for drug sales and prostitution, facilitating the enterprise's most profitable activities.

d. Phillip Gori and Gregg Berger: Provided financial support, arranged bribes to law enforcement, and developed strategies to expand the enterprise's reach.

e. Corrupt Miami Dade Police Department, and Doral Police Department Officers: Falsified reports, dismissed complaints, and harassed whistleblowers to ensure the enterprise's continued operation.

239. Legal Precedent Supporting the Pattern

a. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989): Establishes the need for a continuous and related pattern of racketeering activity to sustain a RICO claim.

b. Reves v. Ernst & Young, 507 U.S. 170 (1993): Holds that individuals who manage or direct an enterprise's affairs are liable for its racketeering activities.

c. United States v. Turkette, 452 U.S. 576 (1981): Confirms that an association-in-fact enterprise can consist of individuals and entities collaborating for a common illegal purpose.

240. Supporting Evidence

a. Exhibit J: Testimonies from trafficking victims detailing their coercion and exploitation.

b. Exhibit K: Surveillance footage of drug transactions occurring within Booby

Trap on the River and Booby Trap Doral.

   c. Exhibit L: Financial records showing fraudulent credit card transactions and payments to law enforcement.

   d. Exhibit M: Internal communications among Defendants discussing bribes and strategies to suppress investigations.

241. Threat of Continued Criminal Activity

   a. The structure and coordination of Defendants' enterprise ensure its continued operation unless disrupted by legal intervention. The ongoing nature of the predicate acts presents a clear and continuing threat to public safety and the rule of law.

242. Jurisdictional Impact on Interstate Commerce

   a. Defendants' trafficking and drug distribution activities involved interstate transportation and financial transactions, directly impacting interstate commerce as required under 18 U.S.C. § 1962.

   b. Fraudulent credit card charges processed through interstate banking systems further illustrate the enterprise's reach and reliance on interstate commerce to sustain its operations.

DAMAGES TO PLAINTIFF

243. As a direct and proximate result of Defendants coordinated illegal activities and retaliatory conduct, Plaintiff has suffered extensive damages, including but not limited to:

   a. Economic Losses

      i. Lost Business Opportunities: Plaintiff's professional relationships, including contracts with major clients such as Whole Foods Market, were irreparably damaged due to Defendants' false allegations and retaliatory actions.

      ii. Financial Expenses: Plaintiff incurred significant legal fees and court costs in defending against baseless criminal charges fabricated by Defendants.

      iii. Loss of Income: Defendants' defamation and intimidation tactics led to the denial of key opportunities, such as SBA loans and other

business financing, which adversely impacted Plaintiff's livelihood.

    iv. Costs of Safety Measures: Plaintiff was forced to implement personal security measures, including relocation and surveillance, to mitigate threats to his safety.

b. Emotional Distress

    i. Severe Psychological Harm: Plaintiff endured ongoing anxiety, depression, and insomnia as a result of Defendants' orchestrated harassment, false arrest, and public defamation.

    ii. Fear and Humiliation: The constant threats, intimidation, and fabricated charges caused Plaintiff to live in perpetual fear for his personal safety and professional reputation.

    iii. Disruption of Daily Life: Plaintiff experienced a significant loss of normalcy, including altering his personal routines and avoiding public spaces due to fear of further retaliation.

c. Reputational Harm

    a. Defamation: Defendants' false statements and public accusations tarnished Plaintiff's personal and professional reputation, causing irreparable harm to his standing in the community and industry.

    b. Loss of Trust: Plaintiff's association with Defendants' criminal enterprise, fabricated by their misrepresentations, created a false perception among colleagues, clients, and business partners.

    c. Permanent Stigma: The public nature of the fabricated charges and defamatory allegations has created a lasting negative impact on Plaintiff's credibility and opportunities for future ventures.

244. Causal Connection to Defendants' Conduct

    a. Defendants' deliberate actions, including fabricated criminal charges, bribery of law enforcement officials, and ongoing harassment, directly caused these damages.

    b. Plaintiff's injuries are a foreseeable result of Defendants' racketeering enterprise and its efforts to suppress his whistleblowing activities.

245. Supporting Evidence

    a. Exhibit C: Financial records and contracts detailing Plaintiff's lost business opportunities.

    b. Exhibit D: Medical records and expert testimony confirming the psychological toll of Defendants' conduct.

    c. Exhibit F: Communications and social media posts evidencing public defamation and reputational harm.

    d. Exhibit H: Police reports and legal filings demonstrating the fabricated charges initiated by Defendants.

246. <u>Relief Sought</u>

    a. Full compensation for his economic losses, including lost income, legal fees, and costs associated with personal security measures.

    b. Non-economic damages for emotional distress, humiliation, and reputational harm.

    c. Punitive damages to deter Defendants from engaging in similar misconduct in the future.

    d. Treble damages under RICO for injuries to Plaintiff's business and property.

<u>LEGAL FOUNDATION</u>

247. Plaintiff's claims are supported by the following legal precedents

    a. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989): Establishes the requirement of a pattern of racketeering activity for a RICO claim.

    b. Reves v. Ernst & Young, 507 U.S. 170 (1993): Confirms that individuals directing an enterprise's affairs can be held liable under RICO.

    c. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479 (1985): Provides that injuries to business or property are actionable under RICO.

    d. United States v. McNair, 605 F.3d 1152 (11th Cir. 2010): Recognizes bribery as a predicate act under RICO.

<u>Relief Sought</u>

248. Plaintiff seeks the following relief for Defendants' violations of RICO:

    a. <u>Treble Damages</u>: Pursuant to 18 U.S.C. § 1964(c), for injuries to Plaintiff's business and property caused by Defendants' racketeering activities.

    b. <u>Compensatory Damages</u>: For Plaintiff's economic losses, emotional distress, and reputational harm.

    c. Punitive Damages: To punish Defendants for their egregious conduct and deter future violations of law.

    d. Attorney's Fees and Costs: Awarded pursuant to 18 U.S.C. § 1964(c).

    e. Injunctive Relief: Prohibiting Defendants from engaging in further racketeering activities and mandating independent oversight of their operations.

    f. Declaratory Relief: Declaring that Defendants' actions violated RICO and federal and state laws.

    g. Other Relief: Any additional relief this Court deems just and proper to ensure justice is served.

249. Statute of Limitations: 4 years (Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143 (1987)).

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff David Brian Elledge respectfully prays for judgment in his favor and against all Defendants, jointly and severally, and requests that this Court grant the following relief:

a)   Compensatory Damages

    a. For economic losses, including but not limited to lost income, business opportunities, legal expenses, and other financial damages incurred due to Defendants' conduct.

    b. For non-economic damages, including emotional distress, humiliation, mental anguish, and reputational harm caused by Defendants' actions.

b)   Treble Damages

    a. Pursuant to 18 U.S.C. § 1964(c) (RICO), for injuries sustained to Plaintiff's business and property resulting from Defendants' racketeering activities.

c)   Punitive Damages

    a. In an amount sufficient to punish Defendants for their malicious, egregious, and unlawful conduct, and to deter similar behavior in the future.

d)   Injunctive Relief

    a. Permanently enjoining Defendants from engaging in any further acts of human trafficking, drug distribution, fraudulent financial schemes, retaliation, or other illegal activities alleged herein.

      b. Mandating the implementation of independent monitoring and compliance mechanisms to ensure Defendants' operations comply with federal and state laws.

e) Declaratory Relief

      a. Declaring that Defendants' conduct violated federal and state laws, including but not limited to 18 U.S.C. § 1962 (RICO), 18 U.S.C. § 1591 (Human Trafficking), and Florida Statutes § 787.06 (Human Trafficking).

f) Attorney's Fees and Costs

      a. Awarding Plaintiff reasonable attorney's fees, litigation expenses, and court costs pursuant to applicable laws, including RICO and other federal statutes.

g) Pre- and Post-Judgment Interest

      a. Awarding interest on any monetary award as permitted by law, including pre-judgment and post-judgment interest, to fully compensate Plaintiff for the harm suffered.

h) Further Relief

      a. Granting such other and further relief as the Court deems just, equitable, and proper under the circumstances to ensure justice is served.

Dated: MIAMI FLORIDA December 25, 2024

/s/ David Brian Elledge, Pro Se
David Brian Elledge
112 Crews Drive
Brunswick, GA 31523
704-783-6027

This document was prepared by:
/s/ Tyrone A. Blackburn, Esq.
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC 90 Broad Street, 2nd Floor New York, NY 10004

## PRESERVATION NOTICE

The term "you," "your," or "yours" as used herein shall refer to you (the recipient of this letter), as well as to the respondents and any individuals responsible for the custody and control of the below information, including, but not limited to, those individuals' administrative assistants, secretaries, agents, employees, information technology personnel and third-party vendors. From this point forward, you are directed to prevent "spoliation," defined as altering, changing, updating, destroying (even if periodically), editing, or deleting any information set forth hereafter.

If you cause any such alteration, destruction, or change, direct it, or allow it to occur, you may be charged with discovery rule violations for which sanctions may be imposed. Further, your failure to abide by this request could result in severe penalties against you and form the basis of legal claims for spoliation.
Electronically Stored Information:

In terms of electronically stored information, you are directed to prevent any destructive, alternative or other change to any web pages, virtual profiles or identical (including, but not limited to, Facebook, Instagram, Pinterest, Twitter, Tumblr, LinkedIn, Snapchat, Google Plus+, Flickr, Vine, About.me, ask.fm etc., or any other social media-based web profile or networking site account), emails, voice messages, text messages, instant messages or messaging systems, recordings, digital recordings, media images and videos, temporary memory, memory sticks, portable memory devices, laptops or computers, CDs, DVDs, USB devices, databases, computer activity logs, internet browsing history (including cookies), network access and server activity logs, word processing files and file fragments, backup and archival files, imaging and facsimile files, electronic calendar and scheduling program files and file fragments as well as any other contact and relationship management data (e.g., Outlook), electronic spreadsheet files and file fragments, pertaining in any way to this controversy of the parties or any potential witnesses. This includes a request that such information not be modified, altered, or deleted due to data compression or disk fragmentation (or other optimization procedures), which processes you are hereby directed to suspend until that data can be preserved, copied, and produced.

You are directed not to modify, alter, or delete or allow modifications, alterations, or deletions to be made to any such electronically stored information. You are further directed to preserve all, and not to destroy any, passwords, decryption productions (including, if necessary, the software to decrypt the files), network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery. Paper Information:

In terms of the paper information, you are directed to preserve any and all emails, videos, texts, memos, reports, documents, notes, correspondence, photographs, investigative information, or other documents which pertain in any way to the controversy, parties, or witnesses in this matter. Through discovery, we expect to obtain from you a number of documents and other data, including text messages, emails, photographs, and other information stored on computers, electronic devices, and telephones.

Although we may bring a motion with a court for order-preserving documents and other data from destruction or alteration, your obligation to preserve documents and other data for discovery, in this case, arises independently from any order on such motion. Electronic documents and the storage media, including but not limited to telephones on which they reside, contain relevant, discoverable information beyond what may be found in printed documents. Therefore, even where a paper copy exists, we will likely seek all documents in their original, electronic form,

along with metadata or information about those documents on the media. We will seek paper printouts of only those documents that contain unique information created after they were printed (e.g., paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting, and redactions) and any paper documents for which no corresponding electronic files exist.

The laws and rules prohibiting the destruction of evidence apply to electronically stored information in the same manner they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until the final resolution of this matter. This may include, but would not be limited to, an obligation to discontinue all data destruction and backup tape recycling policies.

Concerning electronic data created after this letter's delivery date, relevant evidence should not be destroyed. You must take the steps necessary to avoid the destruction of such evidence.

Dated: MIAMI FLORIDA

December 25, 2024

/s/ David Brian Elledge, Pro Se
David Brian Elledge
112 Crews Drive
Brunswick, GA 31523

This Document was prepared by:
/s/Tyrone A. Blackburn, Esq.
Tyrone A. Blackburn, Esq.
T. A. Blackburn Law, PLLC 90 Broad Street, 2nd Floor New York, NY 10004

<u>**CERTIFICATE OF SERVICE**</u>

I, David Brian Elledge hereby certify that a true and correct copy of the foregoing was served upon all parties including Brian McEvoy, attorney for the Defendants located at 1170 Peachtree Street, Suite 2400, Atlanta, Georgia 30309-7676 on this  26th day of December, 2024.

Respectfully submitted,

/s/ David Brian Elledge

David Brian Elledge

112 Crews Drive

Brunswick, GA 31523

704-783-6027

whistleblowermiami@protonmail.com